Opinion delivered June 20, 1888.

## No. 5924.

## CHUBB HOWARD *v.* THE STATE.

1. MURDER—PRACTICE—EVIDENCE.—Antecedent menaces, former grudges and quarrels may be proved on a murder trial to show the state of mind and the malice of the accused at the time of the killing. Under this rule the State was properly permitted to prove former difficulties between the accused and the deceased, and the previous threats made by the accused against the deceased.

2. SAME—NEGLIGENT HOMICIDE—CHARGE OF THE COURT.—Three elements concur to constitute negligent homicide of the second degree: 1. The killing must have occurred in the performance of an illegal act. 2. There must have been an apparent danger of causing the death of the person killed or some other. 3. There must have been no apparent intention to kill, and the homicide must have been the consequence of the act done or attempted to be done. See the opinion and the statement of the case for evidence *held* to raise the issue of negligent homicide of the second degree, and to have demanded of the trial court a charge upon that issue.

3. SAME—IMPEACHING TESTIMONY.—The rule is well settled that a witness may be discredited by proving that on a former occasion he made statements inconsistent with his statements on the trial. The purpose of such contradictory evidence is not, as charged by the court in this case,

merely to test the general credibility of the witness, but to attack the truth of his statement on the particular trial, and the jury have the right to consider it for that purpose.    See the opinion for a charge on the subject *held* erroneous.

APPEAL from the District Court of Colorado.    Tried below before the Hon. George McCormick.

This conviction was in the second degree for the murder of Easter Howard, the wife of the appellant, and the penalty assessed against the accused was a term of seven years in the penitentiary.

Alf Parker, Sr., was the first witness for the State.    He testified that he and the defendant, with their respective families, lived in Colorado county, Texas, in separate houses, twenty-five or thirty steps apart.    The killing of the deceased occurred at night, about a month before Christmas, 1887.    Witness returned early on that night, and about eleven o'clock he heard the defendant coming up the road quarreling with some person, whom at first he did not recognize.    Presently he heard and recognized the voice of his son, Alf Parker, Jr.    Witness then got up and went out of his house.    By that time young Alf Parker had passed the witness's house, and defendant, on his horse, was between his own and the witness's house flourishing his pistol and cursing.    Witness told defendant that he was acting in a manner he ought not to, and that he should stop it.    Defendant replied that he would burn the witness's shirt tail off if he did not go back into the house, and continued to curse.    Defendant then tied his horse to a tree, and started to his own house.    His wife, deceased, met him at the door and said to him:  "Chubb, come into the house, and don't be out there fussing with Grandpa."    Defendant replied to her:  "I will raise smoke around you all," and about that time the pistol was discharged, and a little girl ran out of defendant's house exclaiming:  "Mother is shot!"    The defendant stepped into the house, whither witness followed, and found him lifting the body of his wife from the floor.    She was shot through the neck.    The ball first passed through the door, about an inch from the edge.    Deceased lived about three days.    Witness had no conversation with her after she was wounded.

The witness was familiar with the conjugal life of the defendant and the deceased, the latter of whom was his grandchild.

The two had lived together "like cats and dogs" for several years prior to the killing. Witness several times saw the derendant whip the deceased, and much oftener heard them quarfeling. Three or four weeks before the homicide, the defendant, with a woman in a buggy with him, passed the house of ——, where the deceased saw him, and complained of his conduct. Defendant cursed his wife, and told her that if she did not go home and cook his dinner at once he would wear her out.

Cross examined, the witness said that he was seventy-two years old. He was about twenty steps from defendant at the time that the pistol fired. When the witness spoke to the defendant about his conduct defendant had his pistol down by his side. He was going towards his own house and was near it when the pistol fired. He then dropped the pistol and went into his house. Witness picked up the pistol and followed him, and found him weeping over his wife as if in grief and distress. Defendant soon went to witness's house and got one of witness's boys to go after the doctor. The doctor failing to come that night the defendant got him to go again on the next morning. On the following Monday morning Arch Owens claimed the pistol and witness gave it to him. The night of the shooting was not a very bright one. Witness had no ill feeling towards defendant.

Alf Parker, Jr., was the next witness for the State. He testified that he met the defendant at a church festival on the fatal Saturday night, and they rode home together. They got into a wordy quarrel on the way, and were quarreling when they reached home. At that time the defendant had his pistol in his hand. Witness's father came out of the house and witness rode on. He heard his father reprove the defendant for his conduct, and when he reached a point some distance beyond the defendant's house he heard the report of the pistol. He then turned and rode back towards defendant's house, and when he reached a point within about one hundred yards of it he met the defendant, who gave him his pistol. Witness went to, but not into the defendant's house and did not know who was then in the said house.

John Brown testified, for the State, that he went to the defendant's house about three or four weeks before the killing, and heard the defendant tell his wife if she did not cook his dinner at once he would whip her. They were quarreling, "as people will do." No one was there in a buggy at that time.

Arch Owens testified, for the State, that on the morning of the fatal Saturday the defendant came to witness and told him that he was going to his brother's house on that day and that he would like to borrow the witness's pistol, as a great deal of shooting was constantly going on in that neighborhood. Witness loaned him a pistol, which was returned on Monday by old man Alf Parker, one barrel having been discharged.

The State closed.

Doctor F. E. Norris testified, for the defense, that he was called to see the deceased at the time she was shot. He reached her on Sunday morning and found her suffering intensely from a wound in the neck. The ball entered the windpipe in front, went through the windpipe and ranged downward, but did not pass out of the body. Her condition was too critical to admit of the probing for the ball. The deceased made a statement to the witness on the said Sunday. She was then sane, and knew that she was going to die. Her statement was voluntarily made, without persuasion, inducement or suggestion, and was not in reply to any question propounded by any person. She said that while she wanted witness to do what he could for her she placed herself in the hands of her God, and that she was accidentally shot.

Rev. Mose Howard, a brother of the defendant, was the next witness. He testified that he helped nurse the deceased on the Sunday after she was shot. Soon after the witness reached the house on that morning the deceased asked him for a drink of water. He gave it to her, holding up her head for her to drink. She then said to witness: "Brother Mose, Chubb did not shoot me; I shot myself. I heard Chubb and Grandpa quarreling outside, and I went to the door, pulled it slightly open and told Chubb to come into the house and let Grandpa alone. Chubb said: 'Well, as soon as I put up my horse.' Just as he turned I grabbed the pistol and jerked it back over his shoulder, and it went off and shot me. If I die I don't want Chubb punished." The deceased was sane and conscious of approaching death when she made this statement, and she made it voluntarily, without persuasion, suggestion or interrogation. The defendant was then sitting on the steps, outside of the house, and witness and deceased were alone. Defendant appeared to be much affected and grieved by the shooting of his wife. He attended her tenderly until she died.

Bee Kelley testified, for the defense, that the deceased, before

she died, told him that she was shot by accident and through her own fault, and that if she died she did not want the defendant punished. She was sane and conscious of approaching death, and made the statement voluntarily, and without pe: suasion, etc. Teddy Walker and others, but not the defendant, were in the room at the time.

The defense recalled Alf Parker, Sr., and asked him if he did not testify about the shooting of the deceased before Justice of the Peace Zeigler. He replied that he did. He then stated, in reply to further questions, that he did not see the deceased grab at the pistol in the hands of defendant before it was discharged; that he did not see defendant turn from the door as if to go to his horse; that he did not see defendant's left foot on the door step just before the shooting. To impeach the said Parker the defense then read the testimony taken before the justice of the peace as follows:

"I live on the same place where Easter Howard lived. The difficulty took place about eleven o'clock, November 26, 1887. I saw Chubb Howard when he did the shooting. The pistol was a forty-five caliber, I think. Chubb Howard said before shooting: "Old man, I'll burn your shirt!" He then had the pistol in his hand. When he shot Easter Howard she was on the inside of the house near the door. The ball went through the door facing and struck Easter Howard on the thumb, and then struck her on the neck, severing the windpipe. I have frequently heard Chubb Howard threaten to kill his wife, Easter Howard. He threatened a dozen times or more to cut her throat. They lived a cat and dog life. I do not know whether Chubb Howard shot Easter intentionally or not. The pistol did not go off when Chubb Howard was waving it. When he threw down the pistol, apparently at me, Easter said: "Chubb, don't shoot the old man!" when he shot her. Chubb Howard had his left foot on the door step when Easter grabbed at the pistol Chubb had in his hand and said: "Chubb, you let Grandpa alone." About that time the pistol went off.

The motion for new trial raised the questions discussed in the opinion. .

*W. L. Adkins,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant was tried for the murder of his wife, and was convicted of murder of the second degree, with penalty assessed at seven years in the penitentiary Of the many questions so ably discussed in the brief of his counsel, we select out for examination those which we consider of most importance.

It was not error for the court to admit the evidence objected to of former difficulties which had occurred between the parties, and of previous threats made by the defendant against deceased. Antecedent menaces, former grudges and quarrels are admissible to show the state of mind and malice of the accused at the time of the offense. (Carr v. The State, 41 Texas, 543; Anderson v. the State, 15 Texas Ct. App., 447.)

Three theories are presented by the evidence in this case: First, an intentional killing. Second, an accidental killing; and third, homicide by negligence of the second degree. In his charge to the jury, the trial judge submitted the law applicable to the first two theories, but did not submit any instructions upon the third.

Homicide by negligence of the second degree is that which occurs in the performance of an unlawful act. (Penal Code, art. 578.) "To constitute this offense, there must be an apparent danger of causing the death of the person killed, or some other." (Penal Code, art. 581.) "To bring the offense within the definition of homicide by negligence of the first or second degree, there must be no apparent intention to kill, and the homicide must be the consequence of the act done or attempted to be done." (Penal Code, arts. 584, 585.)

Defendant had just returned from a church festival, to which he had carried a pistol on or about his person, which was an unlawful act. In coming back from the festival, he got into a quarrel with Alf Parker, Jr., during which he drew and held the pistol in his hand, not so much, perhaps, with a view of shooting Alf with it (for it appears there was nothing to prevent his doing so had he so desired), as to intimidate him. When Alf Parker, Sr.,, came out, defendant was cursing and still had the pistol in his hand. This witness says: "I spoke to him, telling him that was no way to be acting, and to stop it. Defendant kept on cursing and replied to me that he would burn my shirt tail off if I did not go back into the house. Defendant then rode to a tree near by and hitched his horse and started to his own house, which was about twenty-five or thirty steps from

my house, and his wife came to the door and said to him: 'Chubb, come into the house and don't be out there fussing with Grandpa.' Defendant said 'I will raise a smoke around you all,' and as he said this the pistol fired." This witness, in his testimony given at the examining trial, held recently after the homicide, testified that "he did not know whether Chubb Howard shot Easter intentionally or not. * * * * Easter grabbed at the pistol Chubb had in his hand, and said, 'Chubb, you let Grandpa alone!' About that time the pistol went off."

Deceased's dying declarations, made to three different parties, were introduced in evidence and in each she stated she was accidently shot. In one of the statements so made, she said: "I heard Chubb and Grandpa quarreling out side (the house), and went to the door and pulled it slightly open, and told Chubb to let Grandpa alone. And Chubb says 'well, as soon as I put up my horse.' And just as he turned, I grabbed the pistol and jerked it back over his shoulder, and it went off and shot me, and if I die, I don't want Chubb punished."

We think it fair to presume from the evidence that if defendant had intended killing the two parties with whom he quarreled, he could have done so, or at all events he could have shot at either of them before the inteference of his wife, since there was nothing to prevent. He did not fire at either. Whilst he had had previous difficulties with his wife, they appear to have been on good terms that night, and defendant's conduct after he found she was shot showed his grief and tended strongly to evidence an unintentional and accidental shooting.

With regard to negligent homicide, these facts, we think, warranted and required a charge of the law upon that subject. In waving his pistol and cursing, and endeavoring to intimidate young Parker in the first instance, and his father in the second, the defendant was unquestionably engaged in an unlawful act. That such conduct might and did produce apparent danger of causing death, if the pistol did go off, is equally apparent. That there was no apparent intention on his part to kill is a conclusion which might have been arrived at by the jury from the other facts, had it been submitted to them. That the homicide was the consequence of his illegal act in having and waving his pistol is most clear.

We are of opinion that the evidence called loudly for a charge upon negligent homicide of the second degree, and that it was error in the court to ignore and fail to instruct upon this phase

of the law.  (Robbins v. The State, 9 Texas Ct. App., 667; Id., 671; Aiken v. The State, 10 Texas Ct. App., 610; Clark v. The State, 19 Texas Ct. App., 495; McConnell v. The State, 13 Texas Ct. App., 390; Curtis v. The State, 22 Texas Ct. App , 227.)

It was attempted upon the part of the defense to impeach the principal State's witness by showing that he had given contradictory testimony on the examining trial.  Upon this matter the court instructed the jury as follows, viz: "A witness may be impeached by proving that he has sworn differently from what he does before you.  This is not done for the purpose of proving that such witness has sworn falsely before you, but to enable you the better to judge of the credibility and worthiness of belief of such witness."  We are of opinion the instruction is erroneous.  "A witness called by the opposing party can be discredited by proving that on a former occasion he made a statement inconsistent with his statement on the trial."  (Whart. on Crim. Evid., 8 ed., sec. 482; 1 Greenleaf on Evid., 13 ed., sec. 462.)  "The legitimate object of the proposed proof is to discredit the witness."

Mr. Webster defines "discredit" to mean "to refuse credence to; not to accept as true; to disbelieve."  If this definition be correct, then the object of the impeaching or contradictory statements is to make the jury disbelieve and not accept as true, and to refuse to give credence to the testimony he has given before them.  In other words, its object is to disprove and falsify the testimony of the witness as sworn to before them.  Such evidence goes to both the discredit of the witness and the falsity of the testimony which is contradicted.  And it is for the jury to say whether such contradictory statements do or do not absolutely disprove and falsify his evidence given on the trial.

For errors in the charge of the court. above pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*